**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

WESTERN WATERSHEDS PROJECT, a
nonprofit organization; GLENN
MONAHAN, in his individual
capacity and as a member of
Western Watersheds Project; NANCY
SCHULTZ, in her individual capacity
and as a member of Western
Watersheds Project,
        *Plaintiffs - Appellants*,

v.

BOB ABBEY, in his official capacity
as Director of the Bureau of Land
Management, an agency of the
United States; GARY SLAGEL, in his
official capacity as Manager of the
Upper Missouri River Breaks
National Monument; GENE R.
TERLAND, in his official capacity as
BLM Montana State Director; GARY
L. BENES, in his official capacity as
Field Manager of BLM's Lewistown
Field Office; BUREAU OF LAND
MANAGEMENT, an agency of the
United States Department of Interior,
        *Defendants - Appellees*,

No. 11-35705

D.C. No.
4:10-cv-00004-
SEH

OPINION

and

BLAINE COUNTY; CHOUTEAU
COUNTY; FERGUS COUNTY;
MISSOURI RIVER STEWARDS;
PHILLIPS COUNTY,
            *Intervenor-Defendants -
                        Appellees.*

Appeal from the United States District Court
for the District of Montana
Sam E. Haddon, District Judge, Presiding

Argued and Submitted
February 5, 2013—Seattle, Washington

Filed June 7, 2013

Before: Raymond C. Fisher, Ronald M. Gould,
and Richard A. Paez, Circuit Judges.

Opinion by Judge Gould

# SUMMARY[*]

## Environmental Law

The panel affirmed in part and reversed in part the district court's summary judgment in favor of United States agencies and officials in an action challenging the Bureau of Land Management's management of grazing within the Upper Missouri River Breaks National Monument in Montana.

The panel held that BLM reasonably interpreted Proclamation No. 7398, 3 C.F.R. § 7398 (2002), to not require programmatic changes to grazing management policies in the Breaks Monument Resource Management Plan, and the Breaks Monument Environmental Impact Statement complied with the National Environmental Policy Act by taking a hard and careful look at grazing impacts.

The panel also held that the Environmental Assessment for the Woodhawk Allotment, located within the Monument, violated the National Environmental Policy Act by not considering a reasonable range of alternatives that included a no- or reduced-grazing option. The panel remanded for the district court to enter an appropriate order requiring BLM to remedy the deficiencies in the Environmental Assessment for the Woodhawk Allotment or to prepare a more detailed Environmental Impact Statement.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Thomas J. Woodbury, Western Watersheds Project, Missoula, Montana, for Plaintiffs-Appellants.

Robert Parke Stockman (argued), Ignacia S. Moreno, Assistant Attorney General, Tyler Welti, Rachel K. Bowen, and David C. Shilton, United States Department of Justice, Environment & Natural Resources Division, Washington D.C.; Sarah Shattuck and Karan Dunnigan, Of Counsel, Office of the Solicitor General, United States Department of the Interior, Washington D.C., for Defendants-Appellees.

Hertha L. Lund (argued), Lund Law, Bozeman, Montana; Steven J. Lechner and Jeffrey Wilson McCoy, Mountain States Legal Foundation, Lakewood, Colorado, for Intervenors-Appellees.

**OPINION**

GOULD, Circuit Judge:

More than two-hundred years ago, the Upper Missouri River Breaks enchanted Lewis and Clark as they traveled westward through what is now north-central Montana. Proclamation No. 7398, 3 C.F.R. § 7398 (2002). The explorers marveled at the area's "most romantic appearance," with white sandstone bluffs that seemed "to rival the human art of masonry." *Id*. They admired the abundant wildlife and observed big-horn sheep, mule deer, elk, and antelope. *Id*. In 2001, President Clinton recognized the biological, historical, and cultural significance of the Breaks country by designating the area as the Upper Missouri River Breaks National

Monument ("Breaks Monument" or "Monument"). The Bureau of Land Management ("BLM"), an agency of the United States Department of the Interior, manages the Monument, an area of unparalleled scenic beauty, great geological and biological import, and special historical significance.

Appellants Western Watersheds Project, Glenn Monahan, and Nancy Shultz (collectively "Western Watersheds") argue that BLM's management of grazing within the Breaks Monument violates the Federal Land Policy and Management Act of 1976 ("FLPMA"), 43 U.S.C. §§ 1701–1787; Proclamation No. 7398, 3 C.F.R. § 7398 (2002); and the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321–4347. Western Watersheds contends that BLM improperly interpreted the Proclamation to exclude programmatic grazing changes from the Breaks Monument Resource Management Plan ("Breaks Resource Plan"). It further argues that the Breaks Monument Environmental Impact Statement ("Breaks EIS") and the site-specific Environmental Assessment ("EA") for the Woodhawk Allotment violated NEPA by not adequately assessing the impacts of livestock grazing within the Monument.

The district court granted summary judgment in favor of Appellees United States Department of the Interior, BLM, and named employees in their official capacities (collectively "BLM"). Western Watersheds appealed. We have jurisdiction to review this appeal under 28 U.S.C. § 1291. We affirm in part and reverse in part. We conclude (1) that BLM reasonably interpreted the Proclamation in developing the Breaks Resource Plan, (2) that the Breaks EIS complied with NEPA, and (3) that the EA for the Woodhawk Allotment

violated NEPA.  We remand for further proceedings on the Woodhawk Allotment permit renewal.

# I

President Clinton established the Breaks Monument by presidential proclamation pursuant to his authority under the Antiquities Act, 16 U.S.C. § 431.  *See* 3 C.F.R. § 7398.  The Breaks Monument comprises more than 375,000 acres of federal land in north-central Montana intermingled with nearly 120,000 acres of state, county, and private land.  The Proclamation's purpose is to protect various "objects" in the Breaks country that have biological, geological, or historical significance.  *Id*.

The Breaks country remains remote and largely undeveloped, so "[m]any of the biological objects described in Lewis' and Clark's journals continue to make the monument their home."  *Id*.  These biological objects include essential habitat for sage-grouse and waterfowl, the Judith River and its tributaries that provide habitat for forty-eight species of fish, and a fully functioning cottonwood gallery forest ecosystem—one of only a few remaining in the Northern Plains.  *Id*.

The Proclamation directs BLM to manage the Breaks Monument pursuant to applicable legal authorities and the Proclamation's purposes and terms.  *Id*.  These terms include provisions that either direct BLM to take a specific action or limit the Proclamation's impact.  *Id*.  One of these provisions, and a key one affecting this lawsuit, states that the "[l]aws, regulations, and policies followed by the [BLM] in issuing and administering grazing permits or leases on all lands under its jurisdiction shall continue to apply with regard to the lands

in the monument." *Id*. Western Watersheds challenges BLM's interpretation of that grazing provision.

BLM concluded that the grazing provision authorized it to follow existing laws, regulations, and policies governing grazing to "protect the objects of the Monument and rangeland resources." This interpretation limited the scope of both the Breaks Resource Plan, which BLM created to guide the agency's management of the Breaks Monument, and the Breaks EIS, which assessed environmental impacts of the Breaks Resource Plan. The Breaks EIS considered six alternatives, but none proposed programmatic changes to grazing management because, importantly, BLM interpreted the Proclamation not to require such changes. The Breaks Resource Plan and Breaks EIS adopted BLM's interpretation and explained that existing laws, regulations, and policies would continue to apply in the Monument. These laws and regulations include the Lewistown District Standards for Rangeland Health and Guidelines for Livestock Grazing Management (Lewistown Standards).

Western Watersheds contends that the Lewiston Standards are inadequate to protect Monument objects and that BLM erred by relying on the Lewiston Standards in the Breaks Resource Plan, the Breaks EIS, and the EA for the Woodhawk Allotment. This contention moves us toward center stage in the drama of this dispute involving grazing within the Breaks area protected by the Proclamation. We must consider both BLM's grazing policies, which may be continued under the Proclamation, and the needs of the Monument objects, some of which are in tension with BLM's existing grazing policies.

The Lewistown Standards were created in 1997 as part of the regional Montana/Dakotas Standards for Rangeland Health and Guidelines for Livestock Grazing Management. BLM regulations mandate the creation of regional or statewide rangeland standards consistent with the fundamentals of rangeland health set forth in those regulations. *See* 43 C.F.R. §§ 4180.1, 4180.2. These regulations also allow for localized standards and guidelines, like those developed for the Lewistown District, "to address local ecosystems and management practices." 43 C.F.R. § 4180.2(b). The Central Montana Resource Advisory Council participated in developing the Lewistown Standards.

The Lewistown Standards set five standards and fourteen guidelines. The "[s]tandards are statements of physical and biological condition or degree of function required for healthy sustainable rangelands." Standards one and two adopt a proper-functioning-condition model to determine upland, riparian, and wetland health. These standards require soil stabilization, adequate vegetation, and a rich biotic community. The guidelines "are preferred or advisable approaches to ensure that standards can be met or that significant progress can be made toward meeting the standard(s)." All BLM rangelands in the Lewistown District must achieve the standards or make measurable progress toward them. The Lewistown Standards are implemented through a watershed planning process that identifies watershed plan areas by grouping grazing allotments that have similar resource values and concerns. Generally, BLM issues ten-year grazing permits for these allotments, and each permit renewal must comply with NEPA.

The Woodhawk Allotment, located within the Monument, is governed by the watershed planning process and the

Lewistown Standards. When the ten-year grazing permit for the Allotment expired on December 31, 2008, BLM proposed renewing the permit for another ten-year period. BLM then conducted an environmental assessment to determine the environmental impact of renewing the permit. With this assessment, BLM released a finding of no significant impact because (1) the permit renewal would facilitate management changes to improve riparian and water quality conditions and (2) it would not impact wildlife, air quality, or cultural resources. The EA considered four alternatives in detail: one no-action alternative, which would implement the same management practices as the previous permit, and three action alternatives that proposed different management practices for the Allotment. Also, the EA considered but did not analyze in detail alternatives that would reduce or eliminate grazing. These reduced-grazing alternatives were eliminated because BLM determined that they did not meet the purpose of the proposed permit renewal. Moreover, because it had considered a no-grazing alternative in the 1979 Missouri Breaks Grazing Environmental Statement, BLM found it unnecessary to consider such an option for the Woodhawk Allotment. Western Watersheds challenges both the BLM's finding of no significant impact and the range of alternatives considered in the Woodhawk Allotment EA.

Western Watersheds's underlying concern is that the Breaks Resource Plan, the Breaks EIS, and the EA for the Woodhawk Allotment ignore the detrimental impacts of livestock grazing on Monument objects, especially riparian areas, cottonwood gallery forest ecosystems, and sage-grouse habitat. Livestock have grazed in the Breaks Monument area since the late 1800s. BLM acknowledges that livestock grazing can significantly affect the protected biological objects of the Monument. Overgrazing reduces habitat

quality for the greater sage-grouse, which can cause increased predation on nests or nest desertion. In riparian areas, grazing degrades water quality, affecting fish and other aquatic species. BLM studies have found hot-season grazing to be a significant cause of the lack of cottonwood and willow regeneration along the Missouri River.

On November 20, 2009, Western Watersheds filed suit in the U.S. District Court for the District of Montana challenging the Breaks Resource Plan, the Breaks EIS, and the EA for the Woodhawk Allotment. This case was consolidated with two other cases challenging the Breaks Resource Plan and EIS.[1] On August 9, 2011, the district court denied Western Watersheds's motion for summary judgment and granted BLM's motion for summary judgment. *In re Montana Wilderness Ass'n*, 807 F. Supp. 2d 990, 1005 (D. Mont. 2011). The district court found reasonable BLM's interpretation that the Proclamation let it manage the Breaks Monument for multiple-use so long as Monument objects were adequately protected. The district court also determined that the Breaks Resource Plan adequately protected Monument objects and did not violate FLPMA. Rejecting Western Watersheds's NEPA claims, the district court concluded that BLM took a "hard look" at grazing impacts in the Breaks EIS and did not err by excluding from consideration programmatic changes to grazing management. The district court also determined that the EA complied with NEPA.

---

[1] Although the district court issued one decision for all three cases, the parties appealed separately. The two other cases, *Montana Wilderness Association v. Terland*, 11-35818, and *The Wilderness Society v. Bureau of Land Management*, 11-35821, were consolidated on appeal and heard by this panel on the same day as this case.

## II

"We review de novo the district court's grant of summary judgment." *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 858 (9th Cir. 2004). The Administrative Procedure Act ("APA") governs our review of BLM's compliance with NEPA and FLPMA. *See Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 641 (9th Cir. 2010). Under the APA, we may set aside BLM's decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 656 (9th Cir. 2009) (quoting 5 U.S.C. § 706(2)(A)). This deferential standard requires us to "ensure that the agency considered the relevant factors and articulated a rational connection between the facts found and the choices made." *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1023 (9th Cir. 2011) (quoting *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007)). But it does not allow us "to substitute our judgment for that of the agency." *Id.*

### III

We proceed to the merits.[2]  Western Watersheds contends that BLM's interpretation of the Proclamation is illogical and violates FLPMA and the Proclamation by unreasonably elevating multiple-use principles above protection of Monument objects.  BLM responds that its interpretation is

---

[2] On appeal, Intervenors-Appellees' moved to strike portions of Western Watersheds's excerpts of record and references to those documents in the opening brief.  The district court had refused to consider this evidence, first by denying Western Watershed's motion to compel supplementation of the administrative record and second by granting BLM's motion to strike the extra-record evidence submitted by Western Watersheds.  We review a district court's ruling on a motion to strike for abuse of discretion. *El Pollo Loco, Inc. v. Hashim*, 316 F.3d 1032, 1038 (9th Cir. 2003).  Western Watersheds raised the issue of the excluded evidence in a two-sentence footnote to the facts section of their opening brief.  Parties must clearly articulate in their opening brief any issues that they intend to raise on appeal. *Christian Legal Soc'y Chapter of Univ. of Cal. v. Wu*, 626 F.3d 483, 485 (9th Cir. 2010) (order). Western Watershed's minimal discussion of the district court's orders in a footnote does not meet this standard. *See id*.  By not properly raising the issue in its opening brief, Western Watersheds waived any challenge to these district court orders. *See Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999).  We also agree with the district court that BLM did not consider the challenged evidence in developing the Breaks Resource Plan, the Breaks EIS, or the EA for the Woodhawk Allotment, and that the evidence did not meet any exception for supplementing the record. *See Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996).  We therefore grant the motion to strike the extra-record evidence submitted by Western Watersheds and any reference to this evidence in Western Watersheds's opening and reply briefs.  Moreover, we decline to take judicial notice of these documents, as urged by Western Watersheds, because the documents contain observations and conclusions that are not "generally known" or "accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).

not unreasonable in light of the plain language and structure of the Proclamation.  We agree.

"FLPMA requires that BLM, under the Secretary of the Interior, 'develop, maintain, and[,] when appropriate, revise land use plans' to ensure that land management be conducted 'on the basis of multiple use and sustained yield.'" *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 555 (9th Cir. 2006) (quoting 43 U.S.C. §§ 1701(a)(7), 1712(a)).  This multiple-use-and-sustainable-yield mandate guides BLM's management of public lands "except that where a tract of such public land has been dedicated to specific uses according to any other provisions of law it shall be managed in accordance with such law."  43 U.S.C. § 1732(a).  Under this provision, BLM must manage the Breaks Monument in compliance with the terms of the Proclamation.  *Id*.[3]

We have previously applied "great deference" to an agency's interpretation of an executive order charged to its administration.  *Kester v. Campbell*, 652 F.2d 13, 15 (9th Cir. 1981); *see also Am. Fed'n of Gov't Emps. v. Fed. Labor Relations Auth.*, 204 F.3d 1272, 1274–75 (9th Cir. 2000).  We explained that an agency's interpretation must be reasonable, but "need not be the only reasonable interpretation."  *Kester*, 652 F.2d at 16.  To determine reasonableness, we adopted the standard applied for reviewing an agency's interpretation of its own regulations.  *Id*. at 15–16.  Under that standard, an agency interpretation is reasonable "unless it is plainly

---

[3] Because § 1732(a) incorporates the Proclamation's terms, we need not consider whether the Proclamation itself is subject to judicial review.  *See City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1166 (9th Cir. 1997) (determining whether Executive Orders were subject to judicial review).

erroneous or inconsistent with the (order)." *Id.* at 16 (quoting *United States v. Larionoff*, 431 U.S. 864, 872 (1977)). We similarly apply that deferential standard to an agency's interpretation of a presidential proclamation it administers. We review the BLM's interpretation to determine whether it is consistent with the Proclamation's language and purpose. *See id*.

BLM's interpretation is reasonable and consistent with the plain language of the Proclamation. The Proclamation recites that "[l]aws, regulations, and policies followed by the [BLM] in issuing and administering grazing permits or leases on all lands under its jurisdiction shall continue to apply with regard to the lands in the monument." 3 C.F.R. § 7398. BLM interpreted this language to mean that the "Monument designation in itself d[id] not mandate a need for an adjustment of forage allocated to livestock." Based on this interpretation, BLM concluded that livestock grazing would continue to be governed (1) by existing laws and regulations that apply to grazing on all BLM public lands and (2) by the Lewistown Standards. BLM then incorporated the Lewistown Standards into the Breaks Resource Plan to control grazing on the Monument.

It was reasonable for BLM to conclude that the plain language of the Proclamation allowed it to continue to apply the Lewistown Standards within the Monument. Nothing in the Proclamation suggests that those Standards should not be considered a "policy" for the purposes of implementing the Proclamation. They were adopted before the Proclamation and are the main policy followed by BLM in administering grazing on its land. Moreover, although it requires the protection of Monument objects, the Proclamation does not foreclose consideration of multiple-use-and-sustainable-yield

principles for grazing management.  These principles are part of the existing law that guides the "[BLM] in issuing and administering grazing permits."  3 C.F.R. § 7398.

The Proclamation's structure also supports the conclusion that BLM's interpretation "sensibly conforms to the purpose and wording of the [Proclamation]."  *Lezama-Garcia v. Holder*, 666 F.3d 518, 525 (9th Cir. 2011).  After discussing the various objects protected by the designation, the Proclamation sets forth several directives and limitations. The directives require the Secretary of the Interior to prepare a transportation plan and prohibit off-road use of motorized vehicles.  3 C.F.R. § 7398.  The limitations restrict the designation's impact on tribal rights and state management of fish and wildlife.  *Id*.  The provision discussing grazing management falls within these limiting provisions.  That placement supports BLM's conclusion that President Clinton intended this to be a restrictive term that did not mandate changes to BLM's grazing management so long as Monument objects were protected.

BLM's interpretation also reasonably reflects the views of then-Secretary of the Interior Bruce Babbitt and the Central Montana Resource Advisory Council expressed while promoting the area for designation.  In response to a request from the Secretary, the Resource Advisory Council recommended to Secretary Babbitt that livestock grazing continue to be managed in accordance with the Lewistown Standards.   Secretary Babbitt approved, stating that "[c]onsistent with the implementation of th[e] [Lewistown] Standards and Guidelines, as well as other applicable law, grazing should continue and BLM's mandates regarding livestock grazing should not be affected."   This correspondence is consistent with BLM's conclusion that the

grazing provision in the Proclamation contemplated a continuing application of the Lewistown Standards.

Western Watersheds argues that BLM's reading of the Proclamation is illogical because it ignores other laws, regulations, and policies followed by BLM in administering grazing. Western Watersheds contends that BLM ignored the Taylor Grazing Act, 43 U.S.C. §§ 315–315n; § 302(b) of FLPMA, 42 U.S.C. § 1732(b); BLM's own regulations; and other BLM policies. But Western Watersheds does not show that the Lewistown Standards conflict with what is required by these authorities. Upon review, the contrary proves true. The Lewistown Standards aim to "maintain or improve resource conditions in upland and riparian habitats" to achieve "healthy sustainable rangelands." This goal does not conflict with the Taylor Grazing Act's purpose of stopping injury to public lands by preventing overgrazing, *see Public Lands Council v. Babbitt*, 529 U.S. 728, 733 (2000), or FLPMA's directive that the Secretary of the Interior "take any action necessary to prevent unnecessary or undue degradation of the lands," 43 U.S.C. § 1732(b). Moreover, we have determined that the "undue degradation" provision of § 1732(b) does not mandate specific BLM action but instead gives BLM "discretion to choose appropriate measures to address the environmental degradation." *Gardner v. U.S. Bureau of Land Mgmt.*, 638 F.3d 1217, 1222 (9th Cir. 2011). We also find no conflict between the Lewistown Standards' purpose and the National Landscape Conservation System's intent to "conserve, protect, and restore nationally significant landscapes." *See* 16 U.S.C.

§ 7202(a).[4]  We recognize that the grazing provision of the Proclamation may reflect a political compromise between conservation values and public use, but any such political matters are beyond the purview of the courts.

Western Watersheds also contends that BLM's interpretation does not reasonably protect Monument objects. They argue that by adopting the Lewistown Standards, the Breaks Resource Plan applies the same failed management strategies employed by BLM for thirty years to the detriment of sage-grouse habitat, cottonwood gallery forest ecosystems, and riparian areas. Western Watersheds is concerned with the Lewistown Standards' use of the properly-functioning-condition standard instead of the potential-natural-community standard.[5]  To the extent that Western Watersheds seeks to challenge the Lewistown Standards or BLM's past management decisions, those matters are not properly before us.  This case is not about the legitimacy of the Lewiston

---

[4] Western Watersheds also contends that BLM's interpretation conflicts with agency guidance and a draft resource management plan implementing a similar presidential proclamation.  We decline to review these documents.  The agency guidance was issued after the Breaks Resource Plan and "may not be advanced as a new rationalization" for attacking BLM's interpretation.  *Sw. Ctr. for Biological Diversity*, 100 F.3d at 1450.  Likewise, the district court refused to take judicial notice of the draft resource management plan because it constituted extra-record evidence, and we decline to review that evidence when that issue was waived on appeal. *See supra* note 2.

[5] A potential-natural-community standard would require BLM to manage the allotment to achieve plant communities "representing the latest successional stage attainable on a specific, hydrological included surface."  According to Western Watersheds, this is a more stringent management standard than the properly-functioning-condition model adopted in the Lewiston Standards.

Standards. It is about the legitimacy of BLM's decision to incorporate those Standards into the Breaks Resource Plan. And any challenges to past BLM management decisions are likely barred by the six-year statute of limitations. *See* 28 U.S.C. § 2401.

Moreover, the record does not support Western Watersheds's argument that Monument objects are threatened by BLM's reliance on the Lewistown Standards. For example, the Breaks Resource Plan sets forth specific restrictions on grazing near sage-grouse leks during the breeding season and provides the option to adjust grazing seasons to protect habitat. It provides that grazing may be adjusted to achieve healthy vegetation goals or other rangeland standards in accordance with 43 C.F.R. § 4180.2(c). BLM could make changes to grazing levels as needed to restore the ecosystem to its properly functioning condition. *See id.*; 43 C.F.R. § 4110.3. It may be true that BLM could adopt more stringent standards for rangeland health, but it does not follow that BLM's decision not to do so violates the Proclamation and FLPMA. We will not substitute our judgment for that of the agency. *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc), *abrogated on other grounds by Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008). Absent evidence that BLM's protection efforts are inconsistent with the Proclamation or contrary to other applicable law, we conclude that there is no error in its interpretation. *See Kester*, 652 F.2d at 16. The record supports BLM's conclusion that adopting the Lewistown Standards in the Breaks Resource Plan gives adequate protection for Monument objects.

We conclude that BLM's interpretation is consistent with the Proclamation's plain language, structure, and history. BLM's interpretation of the Proclamation was reasonable and the Breaks Resource Plan adequately protects Monument objects and does not offend FLPMA. BLM's interpretation of the Proclamation does not mean that BLM lacks authority to reconsider its grazing programs in future actions if necessary to protect Monument objects. We hold only that it was reasonable for BLM to interpret the Proclamation not to require programmatic changes to its grazing practices in the Breaks Resource Plan.

**IV**

We next review whether the Breaks EIS complied with NEPA. Western Watersheds contends that the Breaks EIS violates NEPA in several ways: (1) it improperly determined that programmatic changes to BLM's grazing policies were outside the scope of the Breaks EIS; (2) it did not consider a no-grazing or reduced-grazing alternative; and (3) it did not take a "hard look" at grazing impacts. We conclude that the Breaks EIS did not violate NEPA.

"NEPA is a procedural statute intended to ensure environmentally informed decision-making by federal agencies." *Tillamook Cnty. v. U.S. Army Corps of Eng'rs*, 288 F.3d 1140, 1143 (9th Cir. 2002). It requires federal agencies to take a "hard look" at a proposed project's environmental impacts, but it does not mandate particular results. *Id.* Under NEPA, federal agencies must prepare an EIS before "taking 'major Federal actions significantly affecting the quality' of the environment." *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1067 (9th Cir. 2002) (quoting 42 U.S.C. § 4332(2)(C)). "By definition,

preparation of an RMP**[6]** is a 'major Federal action significantly affecting the quality of the human environment,' and so categorically requires preparation of an EIS."  *Id.* (quoting 43 C.F.R. § 1601.0-6)).  Council on Environmental Quality regulations require an EIS to state the purpose and need of the project and to consider a reasonable range of alternatives.  40 C.F.R. §§ 1502.13, 1502.14.

## A

Western Watersheds argues that BLM erred by defining the scope and purpose of the Breaks EIS to exclude programmatic changes to grazing and by not considering an alternative that provided for grazing reduction or elimination. These arguments are related: a project's scope and purpose define the reasonable range of alternatives that must be analyzed.  *See Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004).

"The 'scope' of an EIS is defined as 'the range of action, alternatives, and impacts to be considered in an [EIS]."  *Nw. Res. Info. Ctr., Inc. v. Nat'l Marine Fisheries Serv.*, 56 F.3d 1060, 1067 (9th Cir. 1995) (quoting 40 C.F.R. § 1508.25). To determine the proper scope of an EIS, agencies should consider (a) connected, cumulative, and similar actions; (b) a no-action alternative, other reasonable alternatives, and mitigation measures; and (c) direct, indirect, and cumulative impacts.  40 C.F.R. § 1508.25.  An agency has "considerable discretion" to define the scope of an EIS.  *Nw. Res. Info. Ctr., Inc.*, 56 F.3d at 1067 (quoting *Thomas v. Peterson*, 753 F.2d 754, 758 (9th Cir. 1985)).

---

**[6]** The court in this statement by "RMP" is referring to a resource management plan.

The scoping process for the Breaks EIS expressly excluded changes to grazing management based on BLM's interpretation of the Proclamation. The EIS defined the Breaks Resource Plan's purpose as:

> provid[ing] a comprehensive plan for managing the Monument and site-specific, detailed plans for managing transportation, visitor use, and oil and gas leases in a manner that protects the objects identified in the Proclamation, while recognizing valid existing rights. The Proclamation requires that BLM manage the Monument in order to implement the purpose of the Proclamation.

This statement highlights specific projects mandated by the Proclamation, none of which required broad changes to BLM's grazing practices.

BLM did not violate NEPA by excluding changes to its grazing practices from the scope and purpose of the Breaks Resource Plan. Because the Breaks Resource Plan was developed to implement the Proclamation's objectives, those objectives guide our analysis of the reasonableness of the purpose outlined in the EIS. *See Westlands Water Dist.*, 376 F.3d at 866 ("Where an action is taken pursuant to a specific statute, the statutory objectives of the project serve as a guide by which to determine the reasonableness of objectives outlined in an EIS."). We have already determined that BLM's interpretation of the Proclamation to allow the continued use of its grazing management was reasonable under FLPMA and the Proclamation. Based on that analysis, BLM also reasonably defined the scope and purpose of the

Breaks Resource Plan in the EIS.  Western Watersheds does not show that NEPA mandates a different conclusion.

It was also reasonable for the Breaks EIS to exclude detailed consideration of a no-grazing or reduced-grazing alternative.  An EIS need not consider in detail an alternative that does not meet the purpose of the project.  *See City of Angoon v. Hodel*, 803 F.2d 1016, 1021 (9th Cir. 1986) ("When the purpose is to accomplish one thing, it makes no sense to consider the alternative ways by which another thing might be achieved.").  But if an alternative is eliminated from detailed study, the agency must "briefly discuss [its] reasons" for doing so.  40 C.F.R. § 1502.14(a).  Here, the EIS explained why it excluded from detailed review two alternatives that would reduce or eliminate grazing.  The EIS considered but eliminated two reduced-grazing alternatives: (1) an alternative to identify lands as not available for livestock grazing and (2) an alternative to reduce or phase out livestock grazing.  BLM rejected the first alternative because the Proclamation did "not require nor suggest" the need to restrict grazing and the existing Lewistown Standards could be used "to mitigate conflicts with Monument uses and values."  Similarly, BLM excluded the second alternative because there was "no documented need to reduce or phase out livestock grazing based on the Proclamation and Standards for Rangeland Health."  Given the scope and purpose of the Breaks Resource Plan, these explanations satisfy NEPA's brief discussion requirement.  *See League of Wilderness Defenders – Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 689 F.3d 1060, 1072–73 (9th Cir. 2012) (concluding that the Forest Service did not err by eliminating from detailed review two alternatives that would not meet the purpose of the proposed action).  We conclude that at the programmatic level of NEPA review, it was reasonable for

BLM to decline to analyze in detail an alternative that would change grazing management levels throughout the entire Monument.

## B

Western Watersheds also contends that the Breaks EIS did not take a "hard look" at grazing impacts. They argue that the Breaks EIS did not adequately analyze these impacts and that it inappropriately tiered to other NEPA documents.[7] The record leads us to opposite conclusions.

NEPA requires agencies "to take a 'hard look' at how the choices before them affect the environment, and then to place their data and conclusions before the public." *Or. Natural Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1099 (9th Cir. 2008). This "hard look" requires a "full and fair discussion of significant environmental impacts" in the EIS. 40 C.F.R. § 1502.1. "General statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 491 (9th Cir. 2011) (citations and alterations

---

[7] Western Watersheds also argues that the Breaks EIS should have disclosed as a cumulative impact that BLM destroyed over two-thousand acres of sage-grouse habitat in 1979 through sagebrush spraying. We disagree. NEPA requires an agency to consider the cumulative impact of the current action "when added to other past, present, and reasonably foreseeable future actions." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214–15 (9th Cir. 1998). Although in some situations discussion of the environmental impact of a thirty-year-old project might be useful and relevant, we conclude that it is not here. The EIS took a "hard look" at environmental impacts on sage-grouse without discussing the 1979 spraying.

omitted).  The requirements of NEPA are procedural and not substantive.  *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978).  They require a responsible federal agency to give a hard and careful look at environmental impacts.  *See Metcalf v. Daley*, 214 F.3d 1135, 1141 (9th Cir. 2000).  Rather than "mandating that agencies achieve particular substantive environmental results . . . , NEPA promotes its sweeping commitment to 'prevent or eliminate damage to the environment and biosphere' by focusing Government and public attention on the environmental effects of proposed agency action."  *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989) (quoting 42 U.S.C. § 4321).

Western Watersheds first contends that BLM violated NEPA by not fully analyzing grazing impacts on Monument objects and by not considering management recommendations made in three scientific studies that assessed environmental impacts of grazing in the Breaks country.  These studies include: the 1989 Inventory Classification and Management of Riparian Sites Along the Upper Missouri National Wild and Scenic Review by Paul Hanson ("Hanson study"); the 2003 study on Flood Dependency of Cottonwood Establishment Along the Missouri River by Michael Scott, et al. ("Scott study"); and the 2004 study on Riparian Forests of the Wild and Scenic Missouri River: Ecology and Management by Greg Kudray et al. ("Kudray study").  We reject this argument.

Our review of the record shows that BLM adequately considered riparian health and grazing impacts in the Breaks EIS.  In more than one section, the EIS addressed grazing impacts on greater sage-grouse habitat, riparian vegetation, and fish and wildlife.  It also discussed range improvements

that would be implemented for each alternative, including constructing new water developments to reduce livestock/wildlife conflicts and promoting adequate ground cover to reduce grazing impacts on soils. Given that the Breaks EIS discussed grazing impacts in detail, Western Watersheds seems to argue that BLM did not look hard enough at grazing. But the record is sufficient to satisfy us that BLM made an informed decision based on its objective, good-faith analysis of grazing's adverse impacts. *See Kraayenbrink*, 632 F.3d at 491.

Also, the record reveals that the Breaks EIS discussed each of the studies that Western Watersheds contends BLM did not consider. The Breaks EIS cited the studies performed by Hansen, Scott, and Kudray multiple times to define the riparian areas affected by the Breaks Resource Plan. That section further noted that the Hansen study and others "show a significant lack of regeneration of cottonwood, willow, and understory species on the Missouri River," which is caused in part by "continuous hot season use by livestock." BLM considered these studies. It simply did not draw the same conclusions about riparian habitat and grazing impacts as does Western Watersheds. In short, Western Watersheds asks us to perform our own scientific review of these studies to conclude that BLM ignored important scientific evidence. But our role is more precisely to "ensure that the agency has adequately considered and disclosed the environmental impact of its actions." *Hells Canyon Alliance v. U.S. Forest Serv.*, 227 F.3d 1170, 1177 (9th Cir. 2000) (quoting *Morongo Band of Mission Indians v. Fed. Aviation Admin.*, 161 F.3d 569, 573 (9th Cir. 1998)). We decline to substitute our judgment for that of BLM, especially with "respect to scientific matters within the purview of the agency."

*Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 993 (9th Cir. 2004).

We are not persuaded by Western Watersheds's remaining argument that the Breaks EIS is deficient because it inappropriately tiered its analysis of grazing impacts to environmental assessments performed for site-specific watershed plans.  "Tiering refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared."  40 C.F.R. § 1508.28.  NEPA regulations encourage tiering to decrease repetition so that agencies can "concentrate on the issues specific to the subsequent action."  40 C.F.R. § 1502.20. Western Watersheds explains that under these regulations it would be improper for BLM to tier the Breaks EIS to environmental assessments performed during the watershed process.  *See* 40 C.F.R. § 1508.28(a).

But Western Watersheds does not explain just how the Breaks EIS tiers to these site-specific environment assessments.    They contend that the Breaks EIS inappropriately tiers to both "existing and anticipated Watershed EAs."  We find no evidence of this in the record. Western Watersheds cites to sections of the EIS that explained how the watershed planning and permit renewal process assesses compliance with the Lewistown Standards. But these discussions merely show how the Lewistown Standards are implemented and do not impermissibly

incorporate environmental review conducted through the watershed planning process.

Western Watersheds's argument that the EIS defers to future environmental assessments of grazing impacts gets no further. It is unclear how an EIS can effectively tier to environmental analysis not yet performed. In effect, this argument restates Western Watersheds's contention that the EIS did not adequately consider grazing impacts. But we have concluded that it did do so. BLM's discussion of how it will conduct more in-depth review at the site-specific level does not indicate that the Breaks EIS improperly "tiered" to these future assessments but only that BLM plans to "fully evaluate[]" site-specific impacts of its future actions. *See Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 800 (9th Cir. 2003).

## C

In concluding that BLM complied with NEPA in developing the Breaks EIS, we distinguish between the two different levels of agency planning and management: programmatic and site-specific. *See id.* When an agency develops an EIS for a programmatic plan like the Breaks Resource Plan, the EIS "must provide 'sufficient detail to foster informed decision-making,' but 'site-specific impacts need not be fully evaluated until a critical decision has been made to act on site development.'" *Id.* (quoting *N. Alaska Envtl. Ctr. v. Lujan*, 961 F.2d 886, 890–91 (9th Cir. 1992)). Our conclusion that the Breaks EIS contains sufficient analysis for informed decision-making at the programmatic level does not reduce or minimize BLM's critical duty to "fully evaluate[]" site-specific impacts. *See id.* Stated another way, BLM's decision to exclude broad changes to its

grazing management throughout the Monument in the Breaks Resource Plan does not avoid its critical obligation to consider changes to grazing preferences at the site-specific stage.  It is to that issue that we now turn.

## V

We consider whether the EA for the Woodhawk Allotment complied with NEPA.  Western Watersheds challenges BLM's finding of no significant impact and argues that BLM should have prepared a full EIS before issuing the renewed permit.  It also contends that BLM did not consider a reasonable range of alternatives because the EA did not consider (1) a no-grazing alternative or (2) an alternative that incorporated the potential-natural-community standard. Western Watersheds further expresses concern that the EA tiers to outdated NEPA documents.

An agency may prepare an environmental assessment to determine whether an EIS is needed.  40 C.F.R. § 1501.4(b). If the environmental assessment shows that the agency action may significantly affect the environment, then the agency must prepare an EIS.  *Nat'l Parks & Conservation Ass'n v. Babbitt,* 241 F.3d 722, 730 (9th Cir. 2001), *abrogated on other grounds by Monsanto Co. v. Geerston Seed Farms*, 130 S. Ct. 2743, 2756–57 (2010).  If an agency concludes in its environmental assessment that the proposed action will not have a significant environmental impact, then it may issue a finding of no significant impact and proceed without further study.  *See Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 599 (9th Cir. 2010).  NEPA's requirement that agencies "study, develop, and describe appropriate alternatives . . . applies whether an agency is preparing an [EIS] or an [EA]."  *N. Idaho Cmty. Action*

*Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008) (per curiam) (citations omitted).  Although an agency must still "give full and meaningful consideration to all reasonable alternatives" in an environmental assessment, the agency's obligation to discuss alternatives is less than in an EIS.  *Id.*  "The existence of a viable but unexamined alternative renders an [EA] inadequate."  *Westlands Water Dist.*, 376 F.3d at 868 (quoting *Morongo*, 161 F.3d at 575).

The Woodhawk Allotment EA considered three action alternatives and one no-action alternative.  The action alternatives each considered issuing a new grazing permit at the same grazing level as the previous permit, 3,120 animal unit months ("AUMs"),[8] but with changes to the terms and conditions of the permit, including range improvements such as installing or removing fencing.  The no-action alternative that BLM considered in the EA "would issue a new grazing permit with 3,120 animal unit months" and have the same terms and conditions as the expiring permit.  Also, the EA considered but did not analyze in detail a no-grazing alternative, a reduced-stocking-level alternative ("reduced-grazing alternative"), and an alternative that would manage the area for potential natural community.  The no-grazing and reduced-grazing alternatives were both excluded for not meeting the purpose and need of the proposed action.  The no-grazing alterative was also excluded because it was previously considered in the 1979 Missouri Breaks Grazing Environmental Statement.  The potential-natural-community alterative was eliminated as unreasonable because it would be impossible to maintain given the project's purpose and need.

---

[8] Animal unit months are defined as "the right to obtain the forage needed to sustain one cow (or five sheep) for one month."  *Public Lands Council*, 529 U.S. at 735.

We are troubled by BLM's decision not to consider a reduced- or no-grazing alternative at the site-specific level, having chosen not to perform that review at the programmatic level. Although we have held above that the decision not to consider these alternatives in the Breaks Resource Plan did not violate NEPA, this decision has deprived BLM of information on the environmental impacts of the unconsidered alternatives. At the site-specific level, then, BLM is operating with limited information on grazing impacts. It is at this stage, when the agency makes a critical decision to act, that the agency is obligated fully to evaluate the impacts of the proposed action. *See 'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1097 (9th Cir. 2006) (explaining that if an agency does not consider reasonable alternatives at the programmatic stage, then it has an "obligation" to consider such alternatives at the site-specific stage). The analysis in the Breaks EIS was sufficient for the proposed programmatic action, but the proposed permit renewal at the site-specific level demands more. Where modification of grazing practices is not considered at a programmatic level for the full Monument area, it is all the more important that agency actions on site-specific areas give a hard and careful look at grazing impacts on Monument objects.

BLM's analysis in the EA does not take this hard and careful look. Each of the four alternatives considered in detail, including the no-action alternative, would have reauthorized grazing at the exact same level—3,120 animal unit months. The distinguishing factors between the no-action alternative and the action alternatives that were voiced by BLM were the terms and conditions imposed on the grazing permit. For example, in Alternative 4, the proposed and selected action, the terms of the new grazing permit

would require relocation of grazing boundaries, replacement of some fencing barriers, and adjustment to riparian objectives to increase water quality. We do not question the environmental soundness of these terms and conditions, as that is not the issue presented to us. But we do question how an agency can make an informed decision on a project's environmental impacts when each alternative considered would authorize the same underlying action—permitting grazing at the level of 3,120 AUMs. There is no meaningful difference between the four alternatives considered in detail as to how much grazing they allow. *See Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 813 (9th Cir. 1998) (per curiam) (concluding that the EIS violated NEPA when the two action alternatives considered in detail were "virtually identical"). Given the varied objects of the Proclamation, and the ways in which grazing in a particular area might affect them, we do not think that readopting prior grazing levels in the Monument without assessment was precisely what the President had in mind in proclaiming that prior grazing policies could continue. True, the prior grazing practices can continue, but BLM must consider if they should be modified in any case where prior grazing practices would substantially harm the objects that the Proclamation declared to be preserved.

The Proclamation's grazing provision did not restrict BLM's authority to change grazing levels; it maintained it.[9]

---

[9] We are persuaded by Judge Winmill's analysis in *Western Watersheds Project v. Salazar*, which analyzed a similar grazing provision in Presidential Proclamation No. 7373. *See* 2011 WL 4526746, at *14 (D. Idaho. Sept. 28, 2001). President Clinton issued that Proclamation on November 9, 2000, to expand the Craters of the Moon National Monument. *Id*. at *7.

The grazing provision says only that existing laws shall continue to apply with regard to grazing management. *See* 3 C.F.R. § 7398. Under those existing laws, BLM has the authority "under the Taylor Act and . . . FLPMA to reclassify and withdraw rangeland from grazing use." *Public Lands Council*, 529 U.S. at 742. FLPMA authorizes BLM to issue ten-year grazing permits "subject to such terms and conditions the Secretary concerned deems appropriate and consistent with governing law." 43 U.S.C. § 1752(a). Renewal of those permits depends, in part, on whether the land remains available for grazing in accordance with the applicable land use management plan. *See* 43 U.S.C. § 1752(c); *Public Lands Council*, 529 U.S. at 742. The Breaks Resource Plan, as the governing land use management plan, makes clear that "[t]he Proclamation requires that the BLM manage the Monument in order to implement the purpose of the Proclamation." From these provisions, it is plain that existing laws permit BLM to make changes to the scope of grazing operations. To this end, the Proclamation and the Breaks Resource Plan both reiterate BLM's authority to reduce or eliminate grazing as needed to protect Monument objects.

Perhaps in recognition of this authority, BLM briefly considered both a no-grazing and a reduced-grazing alternative. This brief discussion, however, does not cure the inadequacies of the other alternatives analyzed in the EA. BLM considered and then dismissed without detailed analysis the no-grazing and reduced-grazing alternatives. The first reason given by BLM for rejecting these alternatives was that they were beyond the purpose and need of the project. But the record shows that these alternatives could feasibly meet the project's goal. Feasible alternatives should be considered in detail. *See Muckleshoot Indian Tribe*, 177 F.3d at 814

(concluding that the Forest Service violated NEPA by considering but preliminary dismissing several feasible alternatives). The purpose and need of the Woodhawk Allotment permit renewal was "to evaluate rangeland health standards and modify current grazing practices on the allotment so that progress can be made toward meeting the standards." Lewiston Standard number two sets forth the specific goal of achieving proper functioning condition in wetland areas, which is indicated in part by diverse composition of vegetation and adequate vegetative cover. It would be reasonable to analyze in detail the environmental impacts of an alternative that authorized something less than 3,120 AUMs before a permit was renewed. Such an alternative could still reasonably meet the purpose of making progress toward meeting the Lewistown Standards, but it might operate in a more friendly way toward the protected objects of the Monument.

The EA also explained that detailed review of a no-grazing alternative was not necessary because such an alternative had been analyzed in the 1979 Missouri Breaks Grazing Environmental Statement. But an agency errs when it relies on old data without showing that the data remain accurate. *See N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1086–87 (9th Cir. 2011) (concluding that the Surface Transportation Board did not take a "hard look" at environmental impacts when it relied on ten-year-old aerial surveys). Here, BLM did not explain why its detailed consideration of an alternative in an analysis made thirty years before the 2009 Woodhawk Allotment EA for purposes of administering grazing over a broad area excuses its duty to fully analyze that alternative now, after decades have passed and after the Proclamation has added protection for the area. Even if the physical environment of the Woodhawk

Allotment is substantially the same, that does not "lead[] to the conclusion that the information regarding habitat and populations of numerous species remains the same as well." *Id.* at 1086. A general assessment of a no-grazing alternative in the 1979 Missouri Breaks Grazing Environmental Statement, which was performed decades before President Clinton issued the Proclamation to protect objects of the Monument, does not avoid the need to consider with care impacts of grazing in the Woodhawk Allotment EA. *See Klamath-Siskiyou Wildlands Ctr.*, 387 F.3d at 997–98 (concluding that it is improper to tier to an EIS that lacks information about specific impacts of a proposed project). The severely dated information in the 1979 Environmental Statement does not give adequate, accurate, and specific data on grazing impacts to Monument objects such as might facilitate an informed decision by BLM.

The Proclamation changed the legal landscape of the permitting process for the Woodhawk Allotment, and BLM must consider this change in determining the reasonable range of alternatives that should be carefully analyzed in the Woodhawk Allotment. *See Natural Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 813 (9th Cir. 2005) ("[W]here changed circumstances affect the factors relevant to the development and evaluation of alternatives, the [agency] must account for such change in the alternatives it considers."). BLM must consider both the terms of the Proclamation and the objects of the Proclamation to be preserved before taking actions that can affect Monument objects. It did not do so when it rejected without analysis the no-grazing alternative or the possibility of more limited grazing.

BLM's second reason for rejecting the reduced-grazing alternative is deficient for the same reason. The EA

explained that in addition to not meeting the purpose and need of the project, the reduced-grazing alternative was contrary to the stocking levels that had been established for the Woodhawk Watershed before the 1998 watershed plan. Again, this explanation does not account for the changed circumstances of the Proclamation. *See id*. These grazing levels may have been sufficient to meet the area's environmental needs before the land was designated as a National Monument, but BLM did not show how maintaining the same grazing levels thereafter is adequate to protect the objects preserved by the Proclamation. BLM's failure to consider the changed circumstances brought by the Proclamation, and the impacts of grazing on protected objects in the Monument within the Woodhawk Allotment, renders the EA inadequate.

BLM responds that the Woodhawk Allotment EA is sufficient because it meets the goals of the Breaks Resource Plan. BLM identifies agency responses to public comments that asked BLM to consider in detail reduced-grazing alternatives. These responses stated that the goals of the EA were in line with those of the Breaks Resource Plan to manage riparian and wetland areas with the aim of making progress toward a "proper functioning condition," to borrow a phrase from the Lewiston Standards, of the ecosystem. The response that mentions protection of Monument objects states simply that Alternative 4 in the EA should protect Monument objects. This may be true, but even so it does not excuse BLM from its heightened obligation to analyze fully other reasonable grazing alternatives that may better protect Monument objects. An alternative to authorizing grazing at 3,120 AUMs could feasibly meet the goals of both the Breaks Resource Plan and the Woodhawk Allotment permit renewal, while better preserving Monument objects. But BLM's

decision not to consider such an alternative, without adequate explanation, shows that it did not take the hard and careful look at impacts of the permit renewal that is required by NEPA.

In conclusion, the EA process for the Woodhawk Allotment was deficient in its consideration of alternatives insofar as it did not consider in detail any alternative that would have reduced grazing levels on the Allotment in light of the Monument's protected objects. BLM cannot ignore the Proclamation's goal of protecting Monument objects when it determines the reasonable range of alternatives for NEPA review of site-specific actions. We make no decision of substance on how a balance should be struck by BLM, but we conclude that the agency's procedural efforts to explore alternatives in the EA did not satisfy NEPA. Because we reverse on this issue, we do not reach Western Watersheds's arguments that BLM should have considered a potential-natural-community standard or that BLM should have prepared an EIS for the Woodhawk Allotment.

## VI

Western Watersheds seeks injunctive relief to limit grazing in riparian areas until the BLM complies with NEPA for the Woodhawk Allotment. Before a court may issue a permanent injunction, a party must show "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto Co.*, 130 S. Ct. at 2756; *Sierra Forest Legacy v. Sherman*, 646 F.3d

1161, 1184 (9th Cir. 2011); *see also Winter*, 555 U.S. at 32 (stating that the standard for issuing a permanent injunction is essentially the same as for a preliminary one except for the need to succeed on the merits). This standard applies equally in NEPA cases—we put no thumb on the scale in favor of an injunction. *Monsanto Co.*, 130 S. Ct. at 2757.

Because the district court concluded that the EA complied with NEPA, it did not consider injunctive relief. We have reached a conclusion on the EA different from that of the district court, but we decline to reach a decision in the first instance on the appropriate remedy and, specifically, whether injunctive relief is proper. We remand to the district court to determine on an appropriate record whether injunctive relief is warranted under the traditional four-factor test. *See Ocean Advocates*, 402 F.3d at 871 (remanding to the district court to consider injunctive relief in the first instance); *see also Natural Res. Def. Council*, 421 F.3d at 816–17 (remanding to the district court to consider a permanent injunction when a Forest Service EIS violated NEPA).

## VII

We hold that BLM reasonably interpreted the Proclamation to not require programmatic changes to grazing management policies in the Breaks Resource Plan and that the Breaks EIS complied with NEPA by taking a hard and careful look at grazing impacts. By contrast, we hold that the EA for the Woodhawk Allotment violated NEPA by not considering a reasonable range of alternatives that included a no- or reduced-grazing option. We reverse and remand for the district court to enter an appropriate order requiring BLM to remedy the deficiencies in the EA for the Woodhawk

Allotment or to prepare a more detailed EIS, whichever is considered appropriate, in a timely matter.

Because this is a mixed judgment, each party shall bear its own costs.

**AFFIRMED IN PART; REVERSED IN PART; REMANDED.**