**WILD FISH CONSERVANCY,
et al., Plaintiffs,**

v.

**NATIONAL PARK SERVICE,
et al., Defendants.**

**Case No. C12–5109 BHS.**

United States District Court,
W.D. Washington,
at Tacoma.

Signed March 26, 2014.

Claire E. Tonry, Elizabeth Hunter Zultoski, Richard Adam Smith, Smith & Lowney PLLC, Seattle, WA, Brian Alan Knutsen, Smith & Lowney PLLC, Portland, OR, for Plaintiffs.

Ethan Carson Eddy, US Department of Justice, Andrea Gelatt, Joseph T. Mathews, Washington, DC, Brian C. Kipnis, US Attorney's Office, Seattle, WA, Carter Howell, US Department of Justice, Portland, OR, for Defendants.

## ORDER

BENJAMIN H. SETTLE, District Judge.

This matter comes before the Court on Plaintiffs Federation of Fly Fishers Steelhead Committee, Wild Fish Conservancy, Wild Salmon Rivers, and Wild Steelhead Coalition's ("Plaintiffs") motion for summary judgment (Dkt. 153) and Defendants Daniel M. Ashe, John E. Bryson, Jonathan B. Jarvis, NOAA Fisheries Service ("NMFS"), National Park Service ("NPS"), Samuel D. Rauch, III, Kenneth L. Salazar, United States Department of Commerce ("DOC"), United States Department of the Interior ("DOI"), and United States Fish and Wildlife Service's ("FWS") (collectively "Federal Defendants") cross motion for summary judgment (Dkt. 164). The Court has considered the pleadings filed in support of and in opposition to the motions and the remainder of the file and hereby grants in part and denies in part the parties cross-motions for summary judgment the motion for the reasons stated herein.

## I. PROCEDURAL HISTORY

On February 9, 2012, Plaintiffs filed a complaint for declaratory and injunctive relief against numerous Defendants alleging numerous violations regarding the implementation of fish hatcheries in the Elwha River. Dkt. 1.

On November 11, 2012, Plaintiffs filed a first supplemental complaint. Dkt. 66. On February 11, 2013, Plaintiffs filed a second supplemental complaint. Dkt. 125.

On February 12, 2013, 2013 WL 549756, the Court granted the motion to dismiss of Defendants Doug Morrill, in his official capacity as the Fisheries Manager for the Lower Elwha Klallam Tribe, Larry Ward, in his official capacity as the Hatchery Manager and Fisheries Biologist for the Lower Elwha Klallam Tribe, Robert Elofson, in his official capacity as the Director of the River Restoration Project for the Lower Elwha Klallam Tribe, and Mike McHenry, in his official capacity as the Fisheries Habitat Biologist and Manager for the Lower Elwha Klallam Tribe. Dkt. 126.

On March 26, 2013, Plaintiffs filed a third supplemental complaint. Dkt. 131.

On June 26, 2013, Plaintiffs filed a motion for summary judgment. Dkt. 153. On July 24, 2013, the Federal Defendants responded and filed a cross-motion for summary judgment. Dkt. 164. On August 7, 2013, Plaintiffs responded to the Federal Defendants' motion. Dkt. 170. On August 21, 2013, the Federal Defendants replied. Dkt. 171. On August 27, 2013, Plaintiffs filed a surreply requesting that the Court strike material that the Federal Defendants submitted in support of their reply. Dkt. 175.

On March 12, 2014, the Court held a hearing on the cross-motions and, during the hearing, requested additional briefing on two issues. *See* Dkt. 185. On March 17, 2014, the Federal Defendants filed a supplemental brief. Dkt. 188. On March 21, 2014, Plaintiffs filed a supplemental brief. Dkt. 189.

## II. FACTUAL BACKGROUND

The Elwha River is approximately forty-five miles in length, flowing north on the Olympic Peninsula in Washington State into the Strait of Juan de Fuca near Port Angeles. NMFS007171; 1104–FWS.[1] The river's watershed encompasses approximately 321 square miles, of which approximately 267 square miles are within the Olympic National Park. NMFS007171; 1104–FWS; and *see* NMFS015983.

The Elwha River was once one of the most productive anadromous fish streams in the Pacific Northwest, believed to have produced nearly 400,000 spawning fish annually. *See* NMFS015982, 033301–02; 774, 866–FWS. In the early 1900's, the Elwha and Glines Canyon Dams were constructed without fish passage structures, and they blocked upstream fish passage to more than 70 miles of mainstem and tributary habitat. NMFS007171; 798, 866, 932–FWS. Salmonids returning to spawn have been confined to the lower 4.9 miles of the river below the Elwha Dam and have not had access to the vast majority of the river's spawning habitat. NMFS007171; 780, 798, 932–FWS. The result was a "precipitous decline of salmonid populations to fewer than 3,000 naturally spawning fish compared to an estimated 392,000 fish prior to dam construction." 774, 798–FWS.

In 1992 Congress passed the Elwha River Ecosystem and Fisheries Restoration Act ("Elwha Act"), Pub.L. 102–495, 106 Stat. 3173 (Oct. 24, 1992), which instructed the Secretary of the Interior to acquire the Elwha and Glines Canyon Dams and submit to Congress a report for "full restoration of the Elwha River ecosystem and the native anadromous fisheries." Elwha Act § 3(c). The DOI submitted the Elwha Report to Congress in 1994. NPS2625.

1. Citations are to the particular department's administrative record. *See* Dkts. 52, 76, & 135.

In 1995, NPS completed the Elwha River Ecosystem Restoration Environmental Impact Statement, which evaluated five alternatives for restoring the Elwha River by wholly or partially removing the dams, or modifying them to incorporate fish passage capabilities. NPS2374–2623 ("Programmatic EIS"). NPS ultimately chose removal of both dams as the only alternative that would meet the stated goal of the Elwha Act. This alternative was referred to as the "Proposed Action" and was described as follows:

> [DOI] proposes to fully restore the Elwha River ecosystem and native anadromous fisheries through the decommissioning of Elwha Dam and Glines Canyon Dam and removal of all structures necessary, including all or part of both dams, powerhouses, reservoirs, and associated facilities to achieve this purpose.

NPS2374.

In 1996, NPS completed the Implementation EIS, which analyzed alternatives for, and environmental impacts of, removing both hydroelectric dams and implementing fisheries restoration measures. NPS1841–2372 ("Implementation EIS"); NPS1822 (1996 Record of Decision). The analysis examined the level of expected sedimentation resulting from the dam removal and the effect it would have on fish. NPS2067–68. NPS found that there were three suspended sediment concentration thresholds for fish: 200 parts per million ("ppm") (causing physiological stress, reduced growth); 1,000 ppm (lethal from chronic exposure); 10,000 ppm (lethal from acute exposure). NPS2067. NPS's modeling predicted that there would be four distinct phases in which there would be "direct losses" of fish, with sedimentation ranges rising as high as 51,000 ppm. NPS068 (table 46). NPS considered hatchery support and outplanting to "ensure protection of fish stocks during periods of high sediment yields." NPS2068–

2070. The discussion and related table referred to outplanting in the middle and upper Elwha River. *Id.*

In July 2005, DOI issued a supplemental EIS ("SEIS") because "several changes" had occurred. ELWHA004440. Although the SEIS was "designed as a stand-alone document for readability," DOI asserted that it was "legally an extension of the [Implementation EIS]." ELWHA004441. The supplement states that "changes and new information have resulted in the need for different mitigation than that analyzed in the [Implementation EIS]." ELWHA004440. DOI proposed mitigation measures to accomplish four goals, two of which relate to the instant matter and are as follows: (1) "to protect municipal and industrial water users and two fish propagation facilities (hatcheries) during dam removal," and (2) "to protect listed fish to the maximum extent possible during and following dam removal." *Id.* Some of the preferred means to accomplish these goals were stated as follows:

> providing access to clean tributary habitat for bull trout; keeping the Washington State Department of Fish and Wildlife [ ("WDFW") ] chinook-rearing channel open during dam removal; moving the tribal fish hatchery; and creating rearing ponds on nearby Morse Creek to ensure the survival of Elwha chinook during dam removal.

*Id.*

The SEIS includes a section describing the actions evaluated and rationale behind these actions. For the fish restoration portion of the supplement, the document provides as follows:

> Since the release of the [Implementation EIS], both Elwha River chinook salmon and bull trout have been listed as federal threatened species. The [FWS] (for bull trout) and [NMFS] (for chinook salmon) will require additions to the fish restoration plan intended to pre-

serve and protect populations of both species. For example, the WDFW rearing channel was to have been closed during dam removal, but it is now going to remain open as a measure to more fully protect the native chinook salmon population during the dam removal process. A bull trout rescue and removal plan is required, and culverts blocking access to tributaries within Olympic National Park that could be used by bull trout as a refuge during dam removal must be replaced or modified. Efforts to remove eastern brook trout from these tributaries prior to culvert removal would be undertaken to prevent hybridization with bull trout. To help mitigate impacts to chinook salmon, dam removal activities would stop during two additional periods each year to facilitate seaward migration of smolts in the spring and upstream migration of adults in the summer and fall. ELWHA004450.

The SEIS recognizes that the proposed actions will affect "species of special concern." ELWHA004455. The summary of the plan with regard to these species was as follows:

Measures taken to preserve the native chinook salmon population during dam removal, including maintaining an artificially propagated chinook population at the WDFW fish-rearing facility, ensuring that the WDFW facility is provided with clean water, and creating a reserve chinook population using Elwha stock in an adjacent watershed (Morse Creek), would offer beneficial outcomes by increasing the likelihood that chinook salmon would be preserved and restored in the Elwha River following dam removal.

Measures to protect bull trout fall into four categories: (1) a plan for rescuing and removing individual bull trout; (2) transporting rescued bull trout to clean water areas; (3) improving accessibility to Elwha River tributaries during and following dam removal; and (4) monitoring effects of dam removal on bull trout habitat from the mouth of the river to the upstream end of Lake Mills. ELWHA004455–004456.

On October 16, 2012, NMFS published notice in the Federal Register that it was formally evaluating these Hatchery and Genetic Management Plans ("HGMPs") and that a draft Environmental Assessment ("EA") was available for public comment. 77 Fed.Reg. 63294 (Oct. 16, 2012). The draft EA incorporated by reference the prior NPS EISs, and analyzed four alternatives in detail. NMFS 9716; 9723–25. Under Alternative 1, the "no action" alternative, NMFS would take no action to either approve or reject the HGMPs, and assumed the State and Tribe would operate the hatcheries under baseline conditions. Under Alternative 2, the proposed action, NMFS would determine that the HGMPs met the criteria of the ESA 4(d) Rule, and the hatchery programs would be implemented as submitted. Alternative 3 analyzed the possibility of NMFS approving revised HGMPs with a "sunset term," stopping hatchery releases around 2019. Alternative 4 considered the effects of a decision by NMFS that the submitted HGMPs did not meet the requirements of the 4(d) Rule, and hatchery programs would be terminated immediately. Plaintiffs submitted comments to the HGMP's and the draft EA. NMFS 10847–11208.

NMFS issued a recommended determination to approve the Elwha River HGMPs under the ESA 4(d) Rule on December 10, 2012. NMFS16131–16204. NMFS also issued a final EA under NEPA that included a FONSI ("Limit 6 EA")[2]

---

**2.** NMFS has promulgated regulations under section 4(d) of the ESA, commonly known as

and a BiOp under section 7 of the ESA ("December 10, 2012 BiOp"). NMFS15375–15509; NMFS015898–16130. The "agency actions" proposed in the recommended determination, and evaluated under NEPA and the ESA, included NMFS' approval of the HGMPs under the ESA 4(d) Rule and DOI's funding of the hatcheries. *See* NMFS16132, NMFS15911–15912. NMFS approved the Elwha River HGMPs under the 4(d) Rule on December 10, 2012. NMFS016205–16213

## III. DISCUSSION

### A. Motions to Strike

■ "[R]eview is limited to 'the administrative record already in existence, not some new record made initially in the reviewing court.'" *San Luis & Delta–Mendota Water Authority v. Jewell,* 747 F.3d 581, 2014 WL 975130 (9th Cir.2014) (quoting *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973)). The Ninth Circuit has, "however, crafted narrow exceptions to this general rule." *Lands Council v. Powell,* 395 F.3d 1019, 1030 (9th Cir.2005). The exceptions are as follows:

> (1) supplementation is necessary to determine if the agency has considered all factors and explained its decision; (2) the agency relied on documents not in the record; (3) supplementation is needed to explain technical terms or complex subjects; or (4) plaintiffs have shown bad faith on the part of the agency.

*Fence Creek Cattle Co. v. U.S. Forest Serv.,* 602 F.3d 1125, 1131 (9th Cir.2010).

In this case, both parties move to strike material submitted with the cross-motions. Dkts. 164 at 28–29, 170 at 8–9, 171 at 8–9, 175.[3] Both parties have failed to show that the contested evidence meets one of the limited exceptions set forth above. Accordingly, the Court will not only grant the motions to strike, but will also limit its review to the agency record.

### B. Summary Judgment

Plaintiffs have asserted claims under the National Environmental Policy Act ("NEPA"), the Endangered Species Act ("ESA"), and the Administrative Procedures Act ("APA"). The parties move for summary judgment on Plaintiffs' Second Claim for Relief (NEPA challenge alleging a failure to prepare supplemental EIS on the Elwha River Fish Restoration Plan ("Fish Restoration Plan")); Dkt. 1, ¶¶ 142–147; Fourth Claim for Relief (ESA § 7(a)(2) challenge alleging a failure to consult on the Fish Restoration Plan), *Id.* ¶¶ 153–157; Seventh Claim for Relief (ESA § 7(a)(2) challenge alleging that the Fish Restoration Plan jeopardizes listed species), *Id.* ¶¶ 172–175; Twelfth Claim for Relief (APA challenge to the July 2012 Biological Opinion ("July BiOp")), Dkt. 66, ¶¶ 23–24; Thirteenth Claim for Relief (APA challenge to NMFS' Limit 6 Exemption), Dkt. 125, ¶¶ 44–45; Fourteenth Claim for Relief (APA challenge to December 2012 Biological Opinion ("December BiOp")), *Id.* ¶¶ 46–47; Fifteenth Claim for Relief (NEPA challenge to NMFS' Environmental Assessment ("EA")), *Id.* ¶¶ 48–

---

the "4(d) Rule," that apply the take prohibition to several threatened salmonid species. 50 C.F.R. §§ 223.102(c)(8) and (23), and 223.203(a). The 4(d) Rule includes several exemptions, commonly referred to as the "4(d) Limits." 50 C.F.R. § 223.203(b). One such exemption—Limit 6—exempts take resulting from the implementation of a joint tribal/state resource management plan that

NMFS has determined "will not appreciably reduce the likelihood of survival and recovery of affected threatened [species]." 50 C.F.R. § 223.203(b)(6)(i).

3. When citing particular pages of the parties' briefs, the Court provides the electronic docket pagination, which appears at the top of each document.

49; Sixteenth Claim for Relief (NEPA challenge alleging a failure to prepare an Environmental Impact Statement ("EIS")), *Id.* ¶¶ 50–51.2.

## 1. Standard

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In this case, the parties agree that the issues may be decided based on the record before the Court and are amenable to summary judgment.

## 2. NEPA

NEPA is a procedural statute, designed to ensure that agencies consider both the environmental impacts of a proposed action, and reasonable alternatives, before proceeding with a federal action. 42 U.S.C. §§ 4321 *et seq.* NEPA aims to foster informed decisionmaking and public participation by making relevant environmental information available to both the agency and the interested public. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).

The NEPA process starts with scoping, a process to determine the scope of the issues to be addressed in an EA or EIS. 40 C.F.R. § 1501.7. Following scoping, the agency may decide to first prepare an EA, to determine whether the environmental effects of the action will be significant. 40 C.F.R. §§ 1501.4(b); 1508.9. An EA must include "brief discussions of the need for the proposal, of alternatives ..., of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b). If, on the basis of the EA, an agency finds that a contemplated action does not "significantly affect[ ] the quality of the human environment," the agency may prepare and issue a Finding of No Significant Impact ("FONSI") outlining why the project will have no significant impact and does not require an EIS. *Dep't of Transp. v. Pub. Citizen,* 541 U.S. 752, 757–58, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004); 40 C.F.R. §§ 1501.4(e), 1508.13.

■ In this case, Plaintiffs assert that the Federal Defendants violated NEPA "by failing to prepare an EIS for their approval and funding of the hatchery programs." Dkt. 153 at 28. The Federal Defendants counter that the use of hatcheries was included in the Implementation EIS and any challenge to the adequacy of that EIS is time barred. Dkt. 164 at 30; Dkt. 171 at 10–11. The Court agrees. The Implementation EIS and the SEIS discussed the use of hatcheries, and the proper time to challenge those documents has passed. 28 U.S.C. § 2401(a) (six-year statute of limitations for APA claims). Plaintiffs may not overcome this bar by arguing that the documents did not fully consider the impacts of the actual implementation of the hatchery programs, which challenges the adequacy of the Fish Restoration Plan attached to the Implementation EIS. *See, e.g.,* Dkt. 170 at 11 ("The Implementation EIS did not evaluate adverse effects associated with hatcheries, nor did it include an analysis of alternatives to the use of hatcheries.") Therefore, the issue is reduced to whether the Limit 6 EA was properly tiered to the EISs.

The Council on Environmental Quality ("CEQ"), an agency created by NEPA within the Office of the President, has promulgated regulations that guide agencies' compliance with the federal statutes. 40 C.F.R. §§ 1500.1–1508.28. Under these regulations, "tiering" is defined as:

[T]he coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared. Tiering is appropriate when the sequence of statements or analyses is:

(a) From a program, plan, or policy environmental impact statement to a program, plan, or policy statement or analysis of lesser scope or to a site-specific statement or analysis.

(b) From an environmental impact statement on a specific action at an early stage (such as need and site selection) to a supplement (which is preferred) or a subsequent statement or analysis at a later stage (such as environmental mitigation). Tiering in such cases is appropriate when it helps the lead agency to focus on the issues which are ripe for decision and exclude from consideration issues already decided or not yet ripe.

*Id.* 1508.28.

In this case, the Federal Defendants assert that the process of early EISs followed by the Limit 6 EA of specific actions contemplated in the EISs "is exactly the type of tiering contemplated by CEQ's regulations." Dkt. 171 at 12. The Court agrees because the "impacts of the hatcheries [is] an issue both 'of lesser scope' than the prior EISs, and 'at a later stage' in the planning process." *Id.* The EISs easily convey the fact that this project is "the largest dam removal project in United States history" (Dkt. 153 at 10) impacting numerous aspects of the environment, including the native runs of salmonids. The proposed actions contemplated the removal activities and sediment flow on the runs and the supplementation of the run with hatchery programs. Once the HGMPs were developed, they were submitted for approval. NMFS conducted an EA on the HGMPs and issued a FONSI. This specific EA was appropriately tiered to the earlier ESIs. Plaintiffs, however, present two arguments that the process was not appropriately tiered.

First, Plaintiffs misconstrue a more general CEQ regulation. Plaintiffs argue that tiering is only appropriate for reducing repetitive discussions. Dkt. 170 at 12 (citing 40 C.F.R. § 1502.20). While this regulation approves summaries of prior statements and incorporation by reference of broader discussions, the regulation clearly states that agencies are "encouraged to tier environmental impact statements" and then directly cites the regulation that provides guidance as to when tiering is appropriate (40 C.F.R. § 1508.20). DOI followed the more specific regulation and the Court declines to accept Plaintiffs' misplaced reading of the more general statute.

Second, Plaintiffs cite three cases for the proposition that an EIS should have been tiered instead of an EA because the prior EISs did not adequately cover the adverse effects of the action. Dkt. 170 at 12. The proper argument, however, is that the current EA is defective because neither the current EA nor the parent EISs adequately account for effects of the proposed action on the environment. *See, e.g., Muckleshoot Indian Tribe v. U.S. Forest Serv.,* 177 F.3d 800 (9th Cir.1999) ("Our review of the [previous] Plan and its accompanying EIS reveals that those documents do not

account for the specific impacts of the [proposed action] and do not remedy the [agency's] failure to account for the impacts of the [proposed action] in the [current] EIS."). Therefore, Plaintiffs' motion is denied on this issue, and the next step is to evaluate the adequacy of the Limit 6 EA.

### 3. The Limit 6 EA

Plaintiffs challenge the adequacy of the Limit 6 EA arguing that it was improperly postponed, it inadequately considers the cumulative impacts on the Puget Sound, it fails to consider appropriate alternatives, and it assumed an inappropriate baseline.

#### a. Improperly Postponed

■ Plaintiffs assert that the "Federal Defendants violated NEPA by postponing processes until after decisions were made and by failing to supplement the Implementation EIS." Dkt. 170 at 19. With regard to the former assertion, the Federal Defendants argue that Plaintiffs lack standing to bring this claim. The Court tends to agree with the Federal Defendants because any redress would result in an even longer postponed EA. Regardless, an agency must complete an EA before making "an irreversible and irretrievable commitment of resources." *Metcalf v. Daley,* 214 F.3d 1135, 1142 (9th Cir. 2000). The record is devoid of any evidence of such an irreversible or irretrievable commitment. Funding of hatcheries can always be stopped and the stipulated preliminary injunction has precluded the introduction of hatchery fish. Therefore, the Court denies Plaintiffs' motion on this issue.

■ With regard to the failure to supplement the Implementation EIS, Plaintiffs' argument is based on their own assessment that the HGMPs will harm the environment. Agencies are required to supplement an existing EIS only where there are "substantial changes to the pro-

posed action" or "significant new circumstances or information" relevant to environmental concerns. 40 C.F.R. § 1502.9(c)(1). To trigger a supplemental EIS, the changes or new information must present "a seriously different picture of the likely environmental harms stemming from the proposed action." *Airport Communities Coal. v. Graves,* 280 F.Supp.2d 1207, 1218 (W.D.Wash.2003) (quoting *Wisc. v. Weinberger,* 745 F.2d 412, 420 (7th Cir. 1984)). Moreover, an agency's decision not to prepare a supplemental EIS will not be overturned absent a "clear error of judgment." *Marsh v. Oregon Natural Res. Council,* 490 U.S. 360, 377–78, 385, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).

■ In this case, the approval of the HGMPs did not require a supplemental EIS because both NMFS and NPS have issued FONSIs on the proposed implementations. These FONSIs completely undermine any argument that implementation of the HGMPs presents a seriously different picture of the likely environmental harms of hatchery fish on the wild runs. Moreover, nothing in the record shows a clear error of judgment by either agency. Therefore, the Court denies Plaintiffs' motion on this issue and grants the Federal Defendants' motion on this issue.

### b. Cumulative Impacts

"NEPA requires an agency to consider" cumulative impacts, which "result[ ] from the incremental impact of the action when added to other past, present and reasonably foreseeable actions regardless of what agency . . . or person undertakes such other actions." *NRDC v. U.S. Forest Serv.,* 421 F.3d 797, 814 (9th Cir.2005) (internal quotation marks omitted); *see also* 40 C.F.R. § 1508.7 (defining cumulative impacts in this way). "Consideration of cumulative impacts requires some quantified or detailed information" that results in a

"useful analysis," even when the agency is preparing an EA and not an EIS. *See Kern v. Bureau of Land Mgmt.*, 284 F.3d 1062, 1075 (9th Cir.2002) (internal quotation marks omitted). "[G]eneral statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Id.* (internal quotation marks omitted).

■ In this case, Plaintiffs argue that the EA does not adequately consider the cumulative impact of other Puget Sound hatchery programs on the Elwha River wild fish. Dkt. 153 at 43–44. In the introduction paragraph to the cumulative impacts section, the EA provides a reference to other "hatchery production." NMFS015487. Specifically, the EA states that "Chapter 3 ... describes baseline conditions, which reflect the effects of past and existing actions (including ... hatchery production)." *Id.* The Federal Defendants argue that the hatcheries were appropriately included in the baseline conditions. The Court agrees because there can be no more quantified or detailed information regarding the incremental impact of the proposed action than the actual numbers of returning fish based on previous releases. With regard to future projects, the EA accounts for such projects in the monitoring requirements of the hatchery programs that protect the wild runs and mitigate for adverse impacts on the wild runs. NMFS015487–015488. Therefore, the Court denies Plaintiffs' motion on this issue and grants Defendants' motion on this issue.

### c. Appropriate Alternatives

■ An EA must contain a "brief discussion of reasonable alternatives." *Ctr. for Biol. Div. v. Salazar*, 695 F.3d 893, 915 (9th Cir.2012); *see* 40 C.F.R. § 1508.9(b). The reasonableness of an alternative is

determined by the "purpose and need" of the project. *League of Wilderness Defs.– Blue Mtns. Biodiv. Project v. U.S. Forest Serv.*, 689 F.3d 1060, 1069 (9th Cir.2012). Alternatives which do not achieve the purpose and need, which are not "significantly distinguishable from alternatives already considered, or which have substantially similar consequences" need not be considered. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246–47 (9th Cir.2005); *Headwaters, Inc. v. BLM*, 914 F.2d 1174, 1180 (9th Cir.1990). Although an agency must still "give full and meaningful consideration to all reasonable alternatives" in an environmental assessment, the agency's obligation to discuss alternatives is less than in an EIS. *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir.2008) (per curiam). "The existence of a viable but unexamined alternative renders an [EA] inadequate." *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir.2004) (quoting *Morongo Band of Mission Indians v. Fed. Aviation Admin.*, 161 F.3d 569, 575 (9th Cir.1998)).

In this case, Plaintiffs argue that the "Limit 6 EA violates NEPA by failing to consider an alternative with smaller hatchery production." Dkt. 153 at 44. In their supplemental brief, the Federal Defendants argue first that NMFS's range of alternatives was reasonable. Dkt. 188 at 7–8. Plaintiffs, however, do not appear to contest the range of alternatives. Plaintiffs argue that NMFS failed to give meaningful consideration to the alternative of reduced releases of hatchery fish. Dkt. 153 at 44–46. Therefore, the Court finds that the Federal Defendants' concern as to the range of alternatives is moot.

■ With regard to the NMFS's selection of alternatives, the Federal Defendants provide four arguments why NMFS met its burden. Those arguments are that

(1) substantially reduced production levels would not ensure Elwha River restoration in a 20- to 30-year time frame, (2) decreased production levels would not satisfy the purpose and need for fulfillment of treaty-reserved fishing rights, (3) the proposed HGMPs contain already-reduced hatchery production levels, and (4) NMFS considered two other alternatives that provided decreased hatchery releases. Dkt. 188 at 9–18.

### i. Restoration

The Federal Defendants argue that the proposed action "would likely produce the minimally acceptable number of adult returns," and, without the release of the proposed numbers, "the remnant Elwha River populations would face the risk of extirpation...." Dkt. 188 at 9–10. To support this argument, the Federal Defendants refer to the December BiOp. *See id.* With regard to Chinook salmon and based on the proposed release, the BiOp estimates a return of 1,685 adult fish. NMFS016055. The BiOp states that 1,700 adult fish "would be required each year just to stock to sustain the hatchery program...." *Id.* While the Federal Defendants are correct that such numbers render the alternative of lesser releases unreasonable, it also renders unreasonable the operation of an unsustainable hatchery program if restoration is the goal of the program. In other words, it is unclear how restoration in 20 to 30 years will be accomplished if the current releases are sufficient to only maintain the status quo.

Contrary to the Chinook release in the mere sustainability range, the steelhead release would result in an overwhelming population of hatchery fish compared to naturally spawning fish. The EA states that average escapement for recent runs is 141 fish, all of natural origin. NMFS015418. The steelhead HGMP proposes a release of 175,000 fish with a survival rate of 0.75%, which means an esti-

mated return of 1,312 hatchery fish. NMFS009031. The release, therefore, would result in approximately 90% of the returning steelhead population as hatchery fish. The Court finds NMFS's conclusion that there is not a meaningful difference, or viable alternative, between 0% and 90% is suspect. *See, e.g., Native Fish Soc'y v. Nat'l Marine Fisheries Serv.,* 992 F.Supp.2d 1095, 1110, 2014 WL 199093 at *10 (D.Or. Jan. 16, 2014) ("Given the obvious difference between the release of approximately 1,000,000 smolts and zero smolts, it is not clear why it would not be meaningful to analyze a number somewhere in the middle..."). Moreover, the proposed actions seem extremely arbitrary if the returning Chinook population is barely enough to sustain the hatchery program whereas the returning steelhead population will result in the overwhelming majority of 90% of the returning and spawning population. There is no explanation, let alone a "brief discussion," of this discrepancy.

With regard to the coho runs, the Federal Defendants argue that the proposed release numbers meet the dual goal of meeting the broodstock collection goals and allowing excess spawners to return to the river. Dkt. 188 at 11. Specifically, based on a release of 425,000 fish, one can expect approximately 2,921 adult fish to return, from which 400–600 would be collected for broodstock. This estimate leaves 2,400 fish per year to help restore the Elwha stock, or roughly 82% of the release will repopulate the river. Again, the Court finds that there is a meaningful difference, or viable alternative, between 0% and 82%, and the record fails to contain even a brief discussion of why a reduced release would result in substantially similar consequences as no release at all. This finding is in accord with recent Ninth Circuit case law wherein the court was "troubled" by the agency's "decision not to

consider a reduced- or no-grazing alternative at the site-specific level, having chosen not to perform that review at the programmatic level." *Western Watersheds Project v. Abbey,* 719 F.3d 1035, 1050–1051 (9th Cir.2013) (concluding that EA was inadequate for failing to considered reduced alternative).

### ii. Fishing Rights

The Federal Defendants argue that decreasing the proposed releases would not meet the purpose and need of meeting the Tribal treaty fishing rights. Dkt. 188 at 14–15. This argument is spurious. First, there is a fishing moratorium through 2018. NMFS015479. Second, even with the proposed action, the Tribe has agreed to base its catch on the number of returning fish. *Id.* (after 2018, Tribe would limit its catch to 50 fish if return exceeds 300 fish). Finally, the detailed analysis of the "reasonable" alternatives only evaluated fishing for steelhead and did not evaluate fishing for any other species. Therefore, this does not appear to be an issue with the proposed releases, let alone a viable reduced release.

### iii. Includes Reduced Release Alternative

The Federal Defendants argue that the proposed alternative already includes reduced releases from those originally proposed by the State and Tribe. Dkt. 188 at 16. There is absolutely no authority for the proposition that an agency may meet its burden of analyzing all viable alternatives by settling on half the initially proposed number instead of taking a "hard look" at the proposed action. Moreover, the reduction from the initial numbers was based on the capacity of the current hatcheries (NMFS15402–015403) and, apparently, involved no consideration of the impact of the proposed release on the wild runs. The reduction also lends support to the notion that the current proposed numbers reflect the maximum capacity of the hatch-

eries and may not be based on consideration of the impacts on the endangered species or the wild runs. Regardless, the Court declines to accept the Federal Defendants' proposition on this issue.

### iv. Two Other Alternatives

The Federal Defendants argue that "NMFS considered two other unique alternatives that provided for fewer releases of hatchery-origin fish." Dkt. 188 at 16. First, the Federal Defendants cite to the alternative with the sunset term. *Id.* While such an alternative considers a reduction of future releases, it fails to consider present releases and is inadequate to overcome the deficiencies set forth above.

Second, the Federal Defendants cite the alternative of operating only the Chinook and steelhead hatcheries. Dkt. 188 at 18. Not only was this alternative merely considered instead of being analyzed, it also fails to address the problems set forth above with these two hatchery programs.

Therefore, the Court grants Plaintiffs' motion as to the inadequacy of the December 2012 EA.

### d. Inappropriate Baseline

Plaintiffs argue that the EA inappropriately assumed that the baseline included the previous Elwha hatchery operations. The Ninth Circuit law, however, is clear that the Court should "defer to the Commission's decision to use an existing project environmental baseline." *American Rivers v. F.E.R.C.,* 201 F.3d 1186 (9th Cir.1999). The Court finds that there is nothing unreasonable in adopting a baseline condition including the hatcheries that have been operating for years before the EA was initiated. Therefore, the Court denies Plaintiffs' motion on this issue.

### C. ESA

 The ESA contains both substantive and procedural requirements designed

to carry out the goal of conserving endangered and threatened species and the ecosystems on which they depend. 16 U.S.C. § 1531(b). Plaintiffs assert numerous arguments that the Federal Defendants failed to comply with the ESA. Dkt. 153 at 48–58. First, Plaintiffs argue that the Federal Defendants improperly segmented consultation between the July BiOp and the December BiOp. Dkt. 153 at 48–50. The July BiOp addressed dam removal, broodstock collection of endangered Chinook and steelhead, and out-planting of these stocks. NMFS008929–008930. The December BiOp addressed the broader ongoing hatchery operations. NMFS015911–0015915. These are not interrelated projects because one could, and did in fact, occur without the other; the dams have been removed and the hatchery releases have been on hold. Therefore, the Court denies Plaintiffs' motion on this issue.

Second, Plaintiffs argue that the Federal Defendants failed to evaluate the full extent of the harm from broodstock collection and failed to adequately define the full extent of take from broodstock activities. Dkt. 153 at 50–52. Contrary to Plaintiffs' contentions, the take explained in the July BiOp was incorporated in the December BiOp's baseline and the December BiOp adequately defined the number of take of endangered species. NMFS016067, NMFS016085. Therefore, the Court denies Plaintiffs' motion on this issue.

Third, Plaintiffs argue that the July BiOp impermissibly relies on undefined mitigation. Dkt. 170 at 26–27. Contrary to Plaintiffs' contention, the July BiOp was amended to include such measures. NMFS13197–13200. The Court finds that these measures are reasonably specific, certain to occur, and capable of implementation. *See Sierra Club v. Marsh*, 816 F.2d 1376 (9th Cir.1987). Therefore, the Court denies Plaintiffs' motion on this issue.

Fourth, Plaintiffs argue that the December BiOp defined an improperly narrow action area. NMFS, however, is accorded deference in defining the action area because it involves "application of scientific methodology...." *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 902 (9th Cir.2002). Even without such deference, the December BiOp provides adequate reasons for the scope of the action area. NMFS015944–015946. Therefore, the Court denies Plaintiffs' motion on this issue.

Fifth, Plaintiffs argue that the December BiOp is inadequate because it fails to define the full extent of take. Plaintiffs, however, fail to show that the Federal Defendants must account for every possible form of take. The Federal Defendants contend that every court to address this "argument has rejected Plaintiffs' novel interpretation." Dkt. 164 at 56; *see, e.g., Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs*, 817 F.Supp.2d 1290, 1305 (D.Or. 2011) ("nothing in the ESA, its implementing regulations, or the case law requires NMFS to develop a surrogate that must address *all* of the stressors that may cause take.") Regardless, the Court finds that it was not arbitrary and capricious for NMFS not to separately account for genetic and ecological effects on the endangered species. Therefore, the Court denies Plaintiffs' motion on this issue.

Finally, under the ESA, Plaintiffs claim that the DOI failed to consult before funding the hatcheries. Dkt. 153 at 55–58. The Court finds that this claim is moot for several reasons. For example, the Court has already addressed Plaintiffs' failure to notify the proper agencies. *See* Dkt. 112. Even if Plaintiffs had notified the proper agencies, the December BiOp properly identifies the "action agencies" and elects NMFS the lead agency for the purpose of the consultation. Therefore, the Court de-

nies Plaintiffs' motion on the DOI's failure to consult because the claim is moot.

## D. Remedies

Under the APA, an agency action held to be unlawful is ordinarily set aside and remanded to the agency. 5 U.S.C. § 706(2); *Fla. Power & Light Co. v. Lorion,* 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985) ("the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation"). However, a court "is not required to set aside every unlawful agency action." *National Wildlife Federation v. Espy,* 45 F.3d 1337, 1343 (9th Cir.1995). Whether a court should grant injunctive relief under the APA is "controlled by principles of equity." *Id.* (citing *Westlands Water Dist. v. Firebaugh Canal,* 10 F.3d 667, 673 (9th Cir.1993); *Sierra Pacific Industries v. Lyng,* 866 F.2d 1099, 1111 (9th Cir.1989)). "When equity demands, [a flawed action] can be left in place while the agency follows the necessary procedures to correct its action." *Cal. Cmtys. Against Toxics v. EPA,* 688 F.3d 989, 992 (9th Cir.2012) (quoting *Idaho Farm Bureau Fed'n v. Babbitt,* 58 F.3d 1392, 1405 (9th Cir.1995) (internal quotation marks omitted)). "Whether agency action should be vacated depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'" *Id.* (quoting *Allied–Signal Inc. v. U.S. Nuclear Regulatory Comm'n,* 988 F.2d 146, 150–51 (D.C.Cir. 1993)).

In this case, the parties informed the Court that they have stipulated to brief the issue of remedies after the Court issues an order on the instant cross-motions. First, the Court is concerned with the spring coho and steelhead releases. In light of the deficiency in the EA, the Court directs the parties to immediately meet and confer regarding Plaintiffs' proposed release of 50,000 steelhead smolt and 50,-000 coho smolt. *See* Dkt. 180 at 24. The portion of the EA regarding releasing no hatchery fish, alternative 4, has been analyzed and found to be an inadequate alternative to meet the purpose and scope of the project. Pending further evaluation of the reduced release alternative, it would seem that Plaintiffs' proposed release would be a good starting point for an agreement.

Second, the Court is also concerned about the fall releases. The parties shall also meet and confer regarding these releases. Pending failure to agree, the parties may file a proposed briefing schedule on these releases as well as additional remedies.

## IV. ORDER

Therefore, it is hereby **ORDERED** that Plaintiffs' motion for summary judgment (Dkt. 153) is **GRANTED in part** and **DENIED in part,** the Federal Defendants' cross motion for summary judgment (Dkt. 164) is **GRANTED in part** and **DENIED in part,** and the parties shall meet and confer regarding remedies as set forth herein.